# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

FAYE B. FEINSTEIN, NOT INDIVIDUALLY,
BUT AS RECEIVER FOR WML GRYPHON
FUND LLC,

        Plaintiff,

    v.                                Case No.

DONALD J. McDONALD, ROBERT S.
MCDONALD, HEATHER MCDONALD
SLEEMAN, MEGHAN HARSHMAN a/k/a
MEGHAN C. McDONALD, and SHAUN P.
McDONALD, each individually and each in his
or her capacity as a trustee of the McDonald
Education Trust U/T/A Dated 11/26/94, and as
trustee of a separate trust created pursuant to
Section 3.2 of the McDonald Education Trust
U/T/A 11/26/94; MARY F. McDONALD,
individually and in her capacity as a trustee of
the McDonald Education Trust U/T/A Dated
11/26/94; DONALD H. McDONALD,
individually and in his capacity as a trustee of the
McDonald Education Trust Created U/T/A Dated
11/26/94; the estate of Donald H. McDonald,
Deceased; SYLVIA McDONALD; and Minors
1-14.

        Defendants.

---

## COMPLAINT

---

        Plaintiff Faye B. Feinstein (the "Receiver"), not individually, but as the court-appointed

receiver for WML Gryphon Fund LLC, a Wisconsin limited liability company ("Gryphon"),

brings this action against the above-named Defendants and alleges as follows:

## NATURE OF COMPLAINT

1.  From March, 2008, through April, 2009 the McDonald Education Trust U/T/A dated 11/26/94 (the "Education Trust"), received a total of $501,242.89 from Gryphon (the "Transfers")[1] in redemption of the Education Trust's equity interest in Gryphon, as follows:

|  |  |
|---|---|
| March  2008 | $    13,388.78 |
| June  2008 | $    13,388.78 |
| July  2008 | $    60,896.91 |
| September  2008 | $    13,388.78 |
| January  2009 | $  313,184.06 |
| April  2009 | $    86,995.58 |

2.  The Transfers total more than 25% of the total amount the Receiver has distributed to date to all remaining 98 Gryphon investors combined.[2]

3.  The managing member of Gryphon, Wealth Management LLC ("WM") – through its principals, James E. Putman ("Putman") and Simone Fevola – exercised sole control over Gryphon and used that control to cause Gryphon to make the Transfers.

4.  The Transfers resulted in the Education Trust receiving a substantially larger share of Gryphon's limited assets than the Education Trust's proportionate equity interest in Gryphon entitled it to receive.

5.  The Education Trust took the Transfers, at times when WM had informed investors in Gryphon that distributions would have to be restricted and, ultimately, suspended.

---

[1] Upon information and belief, Defendant Donald J. McDonald may have received additional payments from Wealth Management LLC itself, before the Receiver's appointment. The term "Transfers" is intended to include any such payments made to Defendant Donald J. McDonald by Wealth Management LLC, and the Receiver reserves the right to amend this Complaint to include a demand for recovery of any such payments.

[2] In May of 2010, the Receiver distributed approximately $1.9 million to Gryphon investors.

2

QB\12277798.3

6.     The Education Trust obtained the Transfers pursuant to a request for redemption that WM and one or more of the Defendants knew, or should have known or should be deemed to have known, had been accepted by WM in violation of the limited liability company operating agreement governing Gryphon and the restrictions on redemptions imposed by WM on other Gryphon investors.

7.     The Receiver seeks return of the Transfers to the Gryphon receivership estate, so that the Receiver may administer those funds equitably, for the benefit of all investors in Gryphon, under her plan for the allocation of receivership assets, as approved by this Court and affirmed by the Seventh Circuit Court of Appeals (the "Seventh Circuit").

## JURISDICTION AND STANDING

8.     On May 20, 2009, the SEC commenced an enforcement action (the "SEC Action") by filing a complaint in this Court (the "SEC Complaint", Docket No. 1 in Case No. 09-C-506 ("Receivership Docket")) against WM, Putman, and Simone Fevola, as defendants, and Gryphon, among other entities (collectively, the "WM Funds"), as relief defendants.[3]

9.     This Court therefore has jurisdiction over this matter pursuant to 28 U.S.C. §§754, 1367(a), and the inherent equitable powers of the Court.  Pursuant to Fed. R. Civ. P. 66, the Federal Rules of Civil Procedure apply to this matter.

10.     Pursuant to this Court's *Order Appointing Receiver* dated May 20, 2009 (Receivership Docket No. 8) and the *First Modified Order Appointing Receiver* (Receivership Docket No. 14) (the "Modified Receiver Order"), Faye B. Feinstein was appointed Receiver for WM and the WM Funds.

---

[3]  In addition to Gryphon, the relief defendants originally named in the SEC Action are WML Watch Stone Partners, L.P., WML Pantera Partners, L.P., WML Palisade Partners, L.P., WML L3, LLC, and WML Quetzal Partners, L.P. The Court later extended the receivership to include Employee Services of Appleton, Inc.

3

11.     The Modified Receiver Order (a) gives the Receiver "control of all funds, assets . . . chooses in action . . . and other property of WM and the WM Funds . . . with full power to monitor and approve . . . any . . . disposition relating to such funds, assets or property, and with full power to take such steps as [s]he deems necessary to secure such . . . property". (Modified Receiver Order, §2.A, at 3-4); (b) authorizes the Receiver to "[trace] the flow of funds between WM and the WM Funds and all clients . . ." (*id.* at 5); and (c) authorizes the Receiver "to implement a plan for recovering investments on behalf of the WM Funds . . . and for the equitable distribution of WM Funds' assets to their investors" (*id.* at 2).

12.     The Receiver therefore has standing to bring this action against Defendants on behalf of Gryphon.

## PARTIES AND RELEVANT NON-PARTIES

13.     Plaintiff Faye B. Feinstein is the Court-appointed Receiver for Gryphon and WM, its managing member.

14.     Defendant Donald J. McDonald is an individual who, upon information and belief, resides in Oshkosh, Wisconsin.

15.     Defendant Donald J. McDonald was, during all or a portion of the period during which the Transfers were made, an equity owner of WM.

16.     Defendant Sylvia McDonald is an individual who, upon information and belief, resides in Oshkosh, Wisconsin.

17.     Upon information and belief, Defendants Donald J. McDonald and Sylvia McDonald are spouses.

4

18. Donald J. McDonald, Donald H. McDonald[4], Robert S. McDonald, Heather McDonald Sleeman, Meghan Harshman a/k/a Meghan C. McDonald, Shaun P. McDonald, Mary F. McDonald, and Sylvia McDonald are, or were, at all relevant times, Trustees of the Education Trust.

19. Donald J. McDonald, Robert S. McDonald, Heather McDonald Sleeman, Meghan Harshman a/k/a Meghan C. McDonald, and Shaun P. McDonald (hereinafter, the "Sub-Trust Trustees") are, or were at all relevant times, beneficiaries of the Education Trust and trustees of the separate trusts created pursuant to Section 3.2 of the Education Trust (each such separate trust, a "Sub-Trust".)

20. Each of Minors 1-14 is, or was, at all relevant times, a beneficiary of his or her respective Sub-Trust (hereinafter, the "Beneficiaries").[5]

21. At all times relevant to this Complaint, the Education Trust either (a) was a member of Gryphon or (b) had transferred its rights to distributions from Gryphon to the Sub-Trusts or the Sub-Trust Trustees, to be held for the benefit of the Beneficiaries.

22. The Education Trust Trustees are, upon information and belief, individuals, each of whom (except Sylvia McDonald and Donald H. McDonald) is a brother or sister of Donald J. McDonald.

23. Upon information and belief, pursuant to Section 3.2 of the Education Trust Agreement, the assets of the Education Trust were divided into 14 Sub-Trusts, one for the benefit of each of the Beneficiaries, who are children of the Sub-Trust Trustees.

---

[4] Upon information and belief, Donald H. McDonald died on or about October 31, 2009; if that is the case, this Complaint is made against his estate, and references to Donald H. McDonald herein should be deemed to be references to the estate.

[5] Because the Receiver cannot be certain, from the information in WM's books and records, which of the beneficiaries, if any, have reached the age of majority, out of caution, she names then here as Minors 1-14 and reserves the right to amend this Complaint to name one or more of the Beneficiaries in the future.

5

24. Upon information and belief, one or more of the Beneficiaries may have received distributions from the relevant Sub-Trust.

25. At all times relevant to this Complaint, the managing member of Gryphon was Wealth Management LLC, a Wisconsin limited liability company and investment advisory firm formerly located in Appleton, Wisconsin.

26. Putman was the founder, Chief Executive Officer, and, at all times relevant to this Complaint, the President or Chairman of the Board of Managers of WM and exercised general control over the operations of WM.

## PROCEDURAL BACKGROUND

27. By orders entered on November 20 and November 30, 2009 (Receivership Docket Nos. 161 and 167, respectively) (collectively, the "Plan Approval Order"), the Court approved the Receiver's *Second Amended Proposed Plan of Allocation of the Assets of Wealth Management LLC, WML Gryphon Fund LLC, WML Watch Stone Partners, L.P., WML Pantera Partners, L.P., WML Palisade Partners, L.P., WML L3, LLC, and WML Quetzal Partners, L.P.* (Receivership Docket No. 163) (the "Plan").

28. The Plan provides, in pertinent part, as follows:

   (a) Investors in the WM Funds, including Gryphon, are to receive pro rata distributions of cash recovered by the Receiver, based on each such investor's "Net Cash", which is defined as total cash investments in the given WM Fund made at any time, *less* cash redemption payments paid to the investor by that WM Fund on or before May 31, 2008. Plan at 26.

   (b) All redemption payments made *after* May 31, 2008, are treated as advance payments of the investor's pro-rata share of that WM Fund's assets. *Id.* at 27.

   (c) The Receiver's right to pursue "claw-back" litigation against investors is expressly preserved. *Id.* at 15.

6

29.     Overruling the objections of certain investors to the strict pro-rata distribution scheme embodied in the Plan, this Court found that giving a distribution preference to investors who had submitted redemption requests pre-receivership would "elevate form over substance", as "no member was 'entitled to receive a distribution' at the time the requests were made", and "none of the investors who made requests for redemption would be considered creditors under the applicable state law".  Plan Approval Order at 8.

30.     Two investors appealed the Plan Approval Order to the Seventh Circuit.

31.     The Seventh Circuit, in *SEC v. Wealth Management LLC, et al.*, Appeal No. 09-4090, affirmed the Plan Approval Order in all respects.  A copy of the Seventh Circuit's slip opinion is attached hereto as Exhibit A (the "Opinion"; the Opinion, which is to be published, is also available on Westlaw at 2010 WL 4862623).

32.     In the Opinion, the Seventh Circuit affirmed the pro-rata distribution provisions described above as being necessary to provide equitable distributions to all investors and made the following determinations, among others:

    (a)     It endorsed this Court's finding that "all investors' claims were substantively the same" – *i.e.*, all investors' rights to receive a distribution from the WM Funds were based on identical status as equity investors – and that redeeming investors "do not qualify as creditors under Wisconsin law", and were not entitled to be paid ahead of other investors; and

    (b)     Pursuant to the Gryphon operating agreement, no investor in Gryphon was entitled to receive distributions in excess of restrictions placed upon distributions by the managing member.

*Id.* at 20-21.

## FACTUAL BACKGROUND

## A.     Defendants' Disappointment with WM and Withdrawal from Gryphon

33.     Gryphon was organized in April 2003 under Chapter 183 of the Wisconsin Statutes (the "LLC Act"), with WM as its managing member.

7

34.     Pursuant to Section 5.5 of the Education Trust Agreement, Defendant Donald J. McDonald (also referred to herein as "Donald") was, for the first 14 years of the Education Trust's existence, solely responsible for investing the assets of the Education Trust for the benefit of himself, his five brothers and sisters, and all of their children.

35.     In that capacity, Donald caused the Education Trust to invest $600,000 in Gryphon.

36.     During the last quarter of 2007, Gryphon restated its returns to investors for the year 2006, which restatement resulted, upon information and belief, in a reduction of approximately $23,000 in the return on the Education Trust's investment in Gryphon previously reported to them for the year 2006.

37.     According to WM, the Gryphon restatement was made necessary by an unrealized loss reported for 2006 by MKA Real Estate Opportunity Fund I, LLC ("MKA"), which represented nearly one-quarter of Gryphon's portfolio.  *See* Receivership Docket No. 77 (Objection to Receiver's Plan), Ex. B (letter dated 12/4/07 to certain Gryphon investors explaining large reduction in value of MKA's portfolio as of year-end 2006); SEC Complaint, Ex. 41 (Gryphon Investment Manager Summary dated 7/1/07, showing 23% of Gryphon funds invested in MKA).

38.     E-mails between Donald and Putman in early January of 2008 (the "January E-Mails") establish that (a) Donald – the Trustee with sole responsibility for investing the Education Trust's assets – was under pressure from "three separate siblings" (who were co-trustees of the Education Trust) to be "out of the Gryphon Fund"; and (b) Donald viewed the restatement of Gryphon returns for 2006 as a loss of $23,000, and he wanted Putman to explain how he could recover the income taxes previously paid on that amount.

39.     In the January E-mails, Donald twice stated that he wanted to remove his money from Gryphon "ASAP!".

40.     WM's records show that Donald, on behalf of the Education Trust, requested a full redemption from Gryphon on or about November 5, 2007, seeking acceptance of the redemption *and* payment by December 31, 2007.

41.     WM's records further show that, the next day, November 6, 2007, WM rejected the November 5 redemption request, noting that no redemptions could be accepted until March 31, 2008.

42.     WM's records further show that WM communicated to Donald in January of 2008 that he would have to submit, on behalf of the Education Trust, another written redemption request in order to redeem the Education Trust's interest in Gryphon during 2008.

43.     WM's records show that, on January 25, 2008, WM received a written request from Donald, on behalf of the Education Trust, to be fully redeemed from Gryphon (the "McDonald Redemption Request").

**B.     Fraudulent Retroactive Acceptance of the McDonald Redemption Request**

44.     Under Gryphon's First Amended and Restated Operating Agreement (the "Gryphon Operating Agreement"), the rules generally applicable to requests for a full redemption were as follows:

> (a)     the "Effective Time" of the redemption would be the last day of the calendar quarter in which the redemption request was submitted, provided that the request was submitted at least 30 days before such date (Gryphon Operating Agreement, §5.3.2, at 9); and

> (b)     90% of the redemption amount would be paid sixty (60) days after the Effective Time of the redemption request, with the final 10% paid after the completion of an audit for the year in which the Effective Time occurred (*id.*, §5.3.3, at 9).

9

45. Therefore, under the Gryphon Operating Agreement and WM's representations to Donald, the McDonald Redemption Request, submitted on January 25, 2008, would not have been effective until March 31, 2008, with the first payment not due until May 30, 2008.

46. WM's records contain an e-mail from Putman to WM employees dated January 30, 2008, memorializing a call with Donald and reporting that communications from WM received by Donald that "indicate that [Gryphon] might not be able to redeem positions until much later" than March 31, 2008, "caused [Donald] much concern. The delay in redemption [and in the preparation of tax documents] is not causing [Donald] peaceful feelings."

47. WM's records show that, on or about February 11, 2008, Putman "left a message with [Donald] regarding exiting from Gryphon *as of 12/31/07* for the Educational [*sic*] Trust" (emphasis added). Donald agreed with WM to have the McDonald Redemption Request, submitted January 25, 2008, retroactively accepted and made effective as of December 31, 2007 – 25 days before it had actually been received, and despite WM's rejection of the November 5th redemption request. *See* copies of e-mails attached hereto as Group Exhibit B.

48. Later that same day, in an e-mail to Donald's tax advisor, Putman confirmed the retroactive effective date, observing that "sometimes little things can soothe the beast! This should take the daggers out of Don's back." *Id.*

49. WM also confirmed that the McDonald Redemption Request would be effective as of December 31, 2007, in a letter to Donald dated February 26, 2008, a copy of which is attached hereto as Exhibit C (the "February 26 Letter").

50. However, Simone Fevola, who was WM's President and Chief Investment Officer, had been giving different information to other investors, informing them that WM was

"requiring all investors to adhere to the process of requesting capital" by "implement[ing] the process in the fund documents".

51.     WM, through Putman, made the same arrangement with only two other Gryphon investors; the circumstances regarding those agreements are described in the Receiver's separate complaints, filed in this Court, against (a) Dennis J. Long, individually and as trustee of the Dennis J. Long & Patricia S. Magnette-Long Joint Revocable Living Trust, Dated 5/14/04, and Patricia S. Magnette-Long, and (b) Brian W. Bender, individually and as trustee of both the Brian W. Bender Personal Revocable Trust and the Brian W. and Marianne P. Bender Joint Revocable Trust, and Marianne P. Bender, individually and as trustee of the Brian W. and Marianne P. Bender Joint Revocable Trust.

52.     Pursuant to Section 3.2 of the Education Trust Agreement, on or about November 26, 2008, the assets of the Education Trust were required to be divided into a certain number of equal shares, each such share to be held in a separate Sub-Trust for the benefit of a Beneficiary.

53.     Upon information and belief, the assets of the Education Trust were so apportioned, with cash and notes receivable placed into the 14 Sub-Trust accounts at an affiliate of Charles Schwab & Co., Inc.

54.     Upon information and belief, each Transfer was made either to the Education Trust, or directly to one or more of the Sub-Trusts.

55.     From the restatement of Gryphon returns and their other communications, WM and Donald, as trustee of the Education Trust, were aware of MKA's financial difficulties and, more generally, of Gryphon's serious liquidity problems.  Both were also aware of the pressure from Donald's co-trustees to exit Gryphon and of Donald's concern that the Education Trust be

11

redeemed out of Gryphon before it was required to apportion its assets among the fourteen Sub-Trusts.

56.     Back-dating acceptance of the McDonald Redemption Request retroactive to December 31, 2007, meant that WM would treat Defendants as "no longer invested in [Gryphon] and . . . not subject to gains and/or losses" (February 26 Letter at 1), such as those caused by the declining value of MKA.

57.     Furthermore, treating the McDonald Redemption Request as effective retroactive to December 31, 2007 meant that WM would provide Defendants with a preferred distribution priority, ahead of all other later redeeming, and non-redeeming, investors.

58.     On February 15, 2008 – four days after Putman gave Donald an opportunity to be one of the first in line for Gryphon's cash – WM sent a letter to all Gryphon investors, including the Education Trust, informing them that, due to liquidity concerns, redemption requests would thereafter be restricted to a maximum of 2% of an investor's capital base per quarter. SEC Complaint, Ex. 54 (the "Two Percent Letter"). The Two Percent Letter indicated that the limitation was necessary "in order to manage the Fund in the best interests of *all members*." *Id.* (emphasis added).

59.     The Two Percent Letter further made it clear that WM intended to strictly enforce the 30-day notice requirement contained in the Gryphon Operating Agreement: WM enclosed redemption election forms with the Two Percent Letter and advised that (a) all investors requesting a redemption were now required to sign a 2% redemption request each quarter, and (b) in order to obtain a quarterly 2% redemption for the quarter ending March 31, 2008, "it is imperative that we receive this signed form no later than February 29, 2008." *Id.*

60.     Finally, the Two Percent Letter advised that previously accepted redemptions would be "grouped by accepted quarterly redemption date (e.g., March 31, June 30, etc.) and *members of those groups will be treated equally* as liquidity becomes available." *Id.* (emphasis added). *Id.*

## C.     WM Suspends Redemptions and Puts Gryphon into Full Liquidation

61.     The Two Percent Letter referred to the two-percent limitation on redemptions as "temporary". In fact, it was; on December 11, 2008, WM sent a letter (the "Liquidation Letter") to all Gryphon investors notifying them that it was "necessary to suspend withdrawals from the Fund in order to protect the interests of all of the Fund's investors ". SEC Complaint, Ex. 26. The Liquidation Letter informed investors that, because "the Fund has no assurance of access to sufficient liquidity to meet timely quarterly withdrawal requests", WM would be managing Gryphon to full liquidation in an effort to "treat all investors fairly and equitably", and Gryphon investors would receive only their pro-rata shares of cash, if and when such cash became available. *Id.*

62.     The Liquidation Letter acknowledged the managing member's "fiduciary duty to treat all investors fairly and equitably" and that "investors may not receive distributions equal to their December 31, 2008, estimated capital account balances." *Id.*

## D.     Defendants' Receipt of, or Benefit from, a Disproportionate Share of Gryphon's Assets

63.     At the time the Two Percent Letter was issued in February of 2008, the Education Trust's remaining cash in Gryphon totaled $504,635.78.

64.     After the Two Percent Letter was issued, WM limited distributions from Gryphon to 2% of each investor's capital account balance per calendar quarter, or a total of 6% of an investor's outstanding capital for the nine-month period before distributions were suspended

13

completely in the fourth quarter of 2008. However, during those same three quarters, the Education Trust received $501,242.89, or 99.33% of its outstanding cash invested in Gryphon at the time the Two Percent Letter was issued.

65. That amount included a payment made to the Education Trust in July 2008 – outside the then-mandated quarterly distribution scheme – totaling $60,896.91, which, by itself, totaled 12.1% of the Education Trust's outstanding cash invested in Gryphon at the time the Two Percent Letter was issued.

66. Aggregate Net Cash invested in Gryphon by all investors (which is calculated, under the Plan, as of May 31, 2008) totaled $46,359,981. *See Receiver's Report Regarding First Distribution of Assets Made on May 3, 2010, Pursuant to Approved Plan of Allocation* (Receivership Docket No. 266) ("First Distribution Report"), Ex. A, at 17. The Education Trust's Net Cash invested in Gryphon totaled $491,247, or 1.06% of the total, which also represents the Education Trust's pro-rata entitlement, under the Plan, to any assets of Gryphon distributed after May 31, 2008.

67. In January and April of 2009, Gryphon received payments totaling $4,434,300 from two of its portfolio funds. SEC Complaint, Ex. 68 (WM responses to certain SEC inquiries). WM and Putman caused Gryphon to distribute that money, in the same months it arrived, as part of an aggregate $4,600,000 distribution to a group composed solely of the Education Trust and the two other investors described above.

68. Although the Education Trust accounted for only 1.06% of the aggregate Net Cash invested in Gryphon, it received 8.7% of the $4,600,000 distributed from Gryphon in January and April of 2009.

69.     Over the life of Gryphon, the Education Trust received redemption payments totaling $596.607.11, on an aggregate investment of $600,000, or 99.4% of its aggregate investment in Gryphon, while virtually all other Gryphon investors have lost the vast majority of their invested funds.

70.     Investors who received no redemption payments from Gryphon after May 31, 2008, have been paid by the Receiver just 8.039% of their Net Cash in Gryphon.

**E.     Gryphon's Financial Status From and After February 2008**

71.     The Two Percent Letter acknowledged that as of February 15, 2008, Gryphon was unable to satisfy accepted redemption requests and established that Gryphon had inadequate assets with which to engage in its stated business of investing in managed funds and securities. Gryphon Confidential Offering Memorandum, SEC Complaint, Ex. 14 at 1; Gryphon Operating Agreement, §1.6.

72.     Prior to July of 2008, over 70% of Gryphon's cash was invested in two vehicles: (a) the Baetis Fund, L.P. ("Baetis"), and (b) MKA.  *See* SEC Complaint, Ex. 41 (Gryphon Investment Manager Summary dated 7/1/07, showing 48.3% of Gryphon Funds invested in Baetis and 23% in MKA).

73.     As to Baetis, notations to Gryphon's audited financial statements as of December 31, 2006 (prepared in January 2009) (SEC Complaint, Ex. 28), show that the majority of Baetis's value was in promissory notes held by Baetis, and that promissory notes accounting for over 80% of the overall value of Baetis's note holdings were then of questionable value and potentially worthless, as they had matured as of November 24, 2008, without being paid or resold.  *Id.* at 3.

15

74. As to MKA, WM admitted to Gryphon investors that the "MKA investment was written down dramatically (approximately 80%) for the period December 2007 through June 2008." *See* SEC Complaint, Ex. 60 (Gryphon Fund Financial Restatement Update from WM dated 12/30/08).

75. The Liquidation Letter dated December 11, 2008 (a) admitted that Gryphon could no longer engage in its stated business or satisfy redemption requests; (b) admitted that Gryphon's assets were likely to realize less cash than was necessary to pay all investors' capital accounts in full, and (c) suspended all redemption payments in favor of pro-rata distributions of whatever cash Gryphon's portfolio could generate in liquidation.

76. The Receiver was appointed on May 20, 2009.

77. Outstanding Net Cash invested in Gryphon (measured, pursuant to the Plan, as of May 31, 2008) totaled $46,359,981. *See* First Distribution Report, Ex. A, at 17. Redemption payments made after May 31, 2008, and before the Receiver's appointment on May 20, 2009, totaled $8,095,551; therefore, outstanding cash invested in Gryphon as of the Receiver's appointment was not less than $38,264,430.

78. At the Receiver's appointment, Gryphon held cash and cash equivalents of just $872,905.77. *See First Report of Receiver* (Receivership Docket No. 27) at 8.

79. Information from the managers of Gryphon's remaining portfolio investments indicates that those assets are, in the aggregate, worth significantly less than the aggregate Net Cash remaining invested in Gryphon as of the Receiver's appointment.

80. Since the Receiver's appointment, (a) Baetis has distributed only $966,996 to Gryphon; (b) the Receiver has learned that Gryphon's cash investment in Baetis, net of all

16

redemptions paid, is $11,679,893; and (c) the Receiver has learned that Baetis holds cash of approximately $800,000.

81.     As to MKA, as of the Receiver's appointment, WM had already written down to zero the value of its equity investment. *See First Report of Receiver* (Receivership Docket No. 27), Ex. 2, at 1.  According to MKA's records provided to the Receiver, Gryphon invested $12,101,120 in MKA and never received any redemption payments.

82.     Since her appointment in May 2009, the Receiver has been able to distribute approximately $1.9 million to Gryphon investors, while the Education Trust received more than 25% of that amount from and after March, 2008.

83.     The admissions of WM, as managing member of Gryphon, in its letters to investors, as well as the stark fiscal realities discussed above, demonstrate that Gryphon was insolvent at the time of, or rendered insolvent by, the Transfers.

## COUNT I: INTENTIONAL FRAUDULENT TRANSFER
### (WIS. STAT. §§242.01(1)(a) AND 242.07(1)(a))

84.     The Receiver incorporates the allegations of Paragraphs 1 through 83 inclusive of this Complaint as though fully set forth herein.

85.     Wis. Stat. §242.04(1)(a) provides that a "transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation [w]ith actual intent to hinder, delay or defraud any creditor of the debtor".

86.     The Transfers were made fewer than four (4) years before the commencement of this action, and this action is therefore timely.  Wis. Stat. §§242.09 and 893.425.

87.     WM, as Gryphon's managing member, exercised control over Gryphon.

88.     WM used its control to make the Transfers to the Education Trust for the benefit of one or more of the Defendants from assets of Gryphon.

17

89.     At the time the Transfers were made, all investors in Gryphon had identical rights to payment from Gryphon's assets in amounts proportionate to their Net Cash invested in Gryphon, pursuant to the LLC Act, the Gryphon Operating Agreement, the Plan, and principles of equity, as affirmed by the Seventh Circuit in its Opinion.

90.     WM's actions deprived Gryphon of assets needed by Gryphon to satisfy its obligations to its investors described above.

91.     WM damaged Gryphon in the amount of the Transfers, which gave rise to a right to payment in favor of Gryphon, as creditor, and against WM, as debtor, a claim now controlled by the Receiver, pursuant to the Modified Receiver Order.

92.     In making the Transfers of Gryphon's assets to the Education Trust, for the benefit of one or more of Defendants, WM intended to hinder, delay, or defraud Gryphon in its ability to satisfy its obligations to its investors, as well as to hinder, delay or defraud Gryphon's investors in their ability to obtain payments from Gryphon.

93.     Alternatively, WM knew or should have known that the natural consequences of making the Transfers would be to deprive Gryphon of assets required to satisfy the pro-rata rights to payment of its investors.

94.     The following are among the circumstances that demonstrate the intentional nature and/or natural consequences of the Transfers:

(a)     The retroactive effective time of the McDonald Redemption Request was not disclosed to all Gryphon investors.

(b)     The retroactive effective time of the McDonald Redemption Request did not comport with the Gryphon Operating Agreement.

(c)     Defendants received a priority to Gryphon assets which was not justified.

(d)     The Transfers constituted a substantial portion of the assets available for payment to Gryphon investors at the time of each Transfer.

(e)     Gryphon was insolvent at the time of the Transfers or became insolvent shortly thereafter.

(f)     Gryphon did not receive any value in exchange for the Transfers.

95.     Wis. Stat. §242.07(1)(a) permits the Receiver, on behalf of Gryphon, to avoid the Transfers of Gryphon's assets made by WM to the Education Trust, to the Sub-Trusts, and/or to the Beneficiaries.

96.     The Education Trust, Donald, the other co-Trustees of the Education Trust, and the Sub-Trustees knew, or should be deemed to know, that (a) the McDonald Redemption Request had been deemed effective as of a date prior to its submission; (b) Gryphon had insufficient assets to pay investors in full and, after December 11, 2008, Gryphon would be managed to full liquidation, and (c) receipt of the Transfers would drain Gryphon of assets that otherwise would have been equitably distributed pro rata to Gryphon's investors.

97.     Defendants, therefore, did not accept the Transfers in good faith.

98.     Pursuant to Wis. Stat. §242.04(1)(a) and 242.07(1)(a), the Court should order Defendants to return the Transfers to the Gryphon receivership estate, so that they may, in turn, be equitably redistributed, pro rata, to all unpaid investors, according to the terms of the Plan.

WHEREFORE, Faye B. Feinstein, as Receiver for WML Gryphon Fund LLC, respectfully demands judgment in her favor and against Defendants, jointly and severally, as appropriate, on Count I of this Complaint and asks the Court to:

A.     order Defendants to pay to the Receiver the value of the Transfers, for the benefit of Gryphon's receivership estate;

B. order Defendants to pay pre-judgment interest on the judgment described in Paragraph (A) at the highest legal rate; and

C. award the Receiver, on behalf of Gryphon, such other and further monetary and equitable relief, including, without limitation, punitive damages, as the Court deems appropriate.

## COUNT II: UNJUST ENRICHMENT

99. The Receiver incorporates the allegations of Paragraphs 1 through 98 inclusive of this Complaint as though fully set forth herein.

100. The Transfers conferred a monetary benefit on all Defendants.

101. Donald, the other co-Trustees of the Education Trust, and the Sub-Trustees were aware, or should be deemed to have been aware, of the benefit conferred upon them by the Transfers.

102. On October 21, 2010, the Receiver made written demand upon Defendant Donald J. McDonald for return of the Transfers.

103. Defendants have not returned the Transfers.

104. Absent the relief requested, Defendants will have received a significantly greater distribution on the Education Trust's investments in Gryphon than all other investors in Gryphon.

105. It would be unjust and inequitable under the circumstances of the fraudulent conveyances alleged herein – including, without limitation, the knowledge, intent, and conduct described herein – to allow Defendants to retain the benefit of the Transfers.

WHEREFORE, Faye B. Feinstein, as Receiver for WML Gryphon Fund LLC, respectfully demands judgment in her favor and against Defendants, jointly and severally, as appropriate, on Count II of this Complaint and asks the Court to:

A.     order Defendants to pay to the Receiver the value of the Transfers, for the benefit of Gryphon's receivership estate;

B.     order Defendants to pay pre-judgment interest on the judgment described in Paragraph (A) at the highest legal rate; and

C.     award the Receiver, on behalf of Gryphon, such other and further monetary and equitable relief, including, without limitation, punitive damages, as the Court deems appropriate.

## COUNT III: CONSTRUCTIVE FRAUDULENT TRANFER
### (WIS. STAT. §§242.01(1)(b), 242.05(1), AND 242.07(1)(a))

106.     The Receiver incorporates the allegations of Paragraphs 1 through 105 inclusive of this Complaint as though fully set forth herein.

107.     Wis. Stat. §242.04(1)(b) provides that a "transfer made . . .  by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . [w]ithout receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor . . . [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction . . . ."

108.     Wis. Stat. §242.05(1) provides that a "transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer...."

109.     Defendants did not provide a reasonably equivalent value to Gryphon in exchange for the Transfers.

110.     The Transfers that WM caused Gryphon to make were made a time when Gryphon was insolvent or caused Gryphon to become insolvent.

21

111.    Alternatively, at the time of the Transfers, Gryphon and WM, as Gryphon's managing member, were engaged in, or were about to engage in, a business and transactions for which the remaining assets of Gryphon were unreasonably small.

112.    Pursuant to Wis. Stat. §§242.04(1)(b) and/or 242.05(1) and 242.07(1)(a), the Court should order Defendants to return the Transfers, so that they may be equitably redistributed, pro rata, to all unpaid investors, according to the terms of the Plan.

WHEREFORE, Faye B. Feinstein, as Receiver for WML Gryphon Fund LLC, respectfully demands judgment in her favor and against Defendants, jointly and severally, as appropriate, on Count III of this Complaint and asks the Court to:

A.    order Defendants to pay to the Receiver the value of the Transfers, for the benefit of Gryphon's receivership estate;

B.    order Defendants to pay pre-judgment interest on the judgment described in Paragraph (A) at the highest legal rate; and

C.    award the Receiver, on behalf of Gryphon, such other and further monetary and equitable relief, including, without limitation, punitive damages, as the Court deems appropriate.

## COUNT IV: UNAUTHORIZED DISTRIBUTIONS
## (WIS. STAT. §183.0905(3))

113.    The Receiver incorporates the allegations of Paragraphs 1 through 112 inclusive of this Complaint as though fully set forth herein.

114.    The Gryphon Operating Agreement provides that it is to be governed by Wisconsin law.  Gryphon Operating Agreement, §14.9, at 22.

115.    Wis. Stat. §183.0905(3) provides that, unless otherwise provided in a limited liability company's operating agreement, members of a limited liability company that is winding

up are entitled to distributions of the company's remaining assets "in proportion to [the] respective values" of their contributions to the company.

116. The Transfers to the Education Trust were grossly disproportionate to the value of the Education Trust's contributions to Gryphon, as evidenced by its Net Cash invested in Gryphon.

117. The Gryphon Operating Agreement did not provide for disproportionate distributions to the Education Trust.

118. The Transfers were made in violation of Wis. Stat. §183.0905(3) and, therefore, in breach of the Gryphon Operating Agreement.

119. The Transfers were made to one or more of the Defendants fewer than years (6) years before the commencement of this action, and this action is therefore timely. Wis. Stat. §893.43 (statute of limitations applicable to actions on contract).

WHEREFORE, Faye B. Feinstein, as Receiver for WML Gryphon Fund LLC, respectfully demands judgment in her favor and against Defendants, jointly and severally, as appropriate, on Count IV of this Complaint and asks the Court to:

A. order Defendants to pay to the Receiver the value of the Transfers, for the benefit of Gryphon's receivership estate;

B. order Defendants to pay pre-judgment interest on the judgment described in Paragraph (A) at the highest legal rate; and

C. award the Receiver, on behalf of Gryphon, such other and further monetary and equitable relief, including, without limitation, punitive damages, as the Court deems appropriate.

## COUNT V: WRONGFUL DISTRIBUTIONS
### (WIS. STAT. §183.0608)

120.    The Receiver incorporates the allegations of Paragraphs 1 through 119 inclusive of this Complaint as though fully set forth herein.

121.    Wis. Stat. §183.0608 provides that "a member . . . who . . . assents to a distribution in violation of . . . §183.0607 or of an operating agreement is personally liable to a limited liability company for the amount of the distribution that exceeds what could have been distributed without violating §183.0607 or the operating agreement."

122.    As described in the "FACTUAL BACKGROUND" section of this Complaint, at the time each Transfer was made, that Transfer violated the provisions of the Gryphon Operating Agreement, in that (a) the retroactive effective time of the McDonald Redemption Request did not comport with the Gryphon Operating Agreement; and (b) the Transfers did not comport with the Two Percent Letter or the Liquidation Letter.

123.    Further, Wis. Stat. §183.0607(1) provides that "a limited liability company may not declare or make a distribution to any of its members if, after giving effect to the distribution, any of the following would occur: (a) [t]he limited liability company would be unable to pay its debts as they become due in the usual course of business [or] (b) [t]he fair value of the limited liability company's total assets would be less than the sum of its total liabilities plus [amounts needed to satisfy any member rights to preferential distributions upon dissolution]".

124.    Wis. Stat §183.0607(3) provides that "the effect of a distribution for the purposes of [§183.0607(1)] is measured as of . . . (a) [t]he date on which the distribution is authorized if the payment occurs within 120 days after the date of authorization [or] (b)[t]he date on which payment is made if the payment occurs more than 120 days after the date of authorization".

QB\12277798.3

125. For purposes of Wis. Stat. §183.0607(1) and (3), the effect of each Transfer upon Gryphon is measured as of the date the Transfer was made.

126. As described in the "FACTUAL BACKGROUND" section of this Complaint, at the time each Transfer was made, Gryphon had insufficient assets to satisfy its members' outstanding and accepted redemption requests.

127. WM, acting through Putman, assented to the Transfers.

128. Donald, as Trustee of the Education Trust, assented to the Transfers.

129. The Transfers were made at times when no amounts could be distributed to the Education Trust without violating Wis. Stat. §183.0607 or the Gryphon Operating Agreement.

130. Wis. Stat. §183.0608(3) requires an action under Wis. Stat. §183.0608 to be brought within two (2) years after the date on which the effect of the distribution is measured under Wis. Stat. §183.0607.

131. Because the Transfers could not have been discovered by a party willing and able to commence this action until WM was removed from control of Gryphon by the Court's appointment of the Receiver in May, 2009, the period described by Wis. Stat. §183.0608(3) is measured from the date the Receiver was appointed, *i.e.*, the Transfers should be deemed made, for the purposes of Wis. Stat. §183.0608(3), on the date the Receiver was appointed. So measured, this action is timely as to all of the Transfers.

132. Pursuant to Wis. Stat. §183.0608, Defendants are personally liable to Gryphon for the amount of the Transfers.

WHEREFORE, Faye B. Feinstein, as Receiver for WML Gryphon Fund LLC, respectfully demands judgment in her favor and against Defendants, jointly and severally, as appropriate, on Count V of this Complaint and asks the Court to:

A.     order Defendants to pay to the Receiver the value of the Transfers, for the benefit of Gryphon's receivership estate;

B.     order Defendants to pay pre-judgment interest on the judgment described in Paragraph (A) at the highest legal rate; and

C.     award the Receiver, on behalf of Gryphon, such other and further monetary and equitable relief, including, without limitation, punitive damages, as the Court deems appropriate.

## COUNT VI: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

133.     The Receiver incorporates the allegations of Paragraphs 1 through 132 inclusive of this Complaint as though fully set forth herein.

134.     In the Liquidation Letter, WM, as Gryphon's managing member, acknowledged its "fiduciary duty to treat all investors fairly and equitably" in the context of a liquidation in which "investors may not receive distributions equal to their December 31, 2008, estimated capital account balances." *Id.*

135.     In the Two Percent Letter, WM, as Gryphon's managing member, acknowledged that it had decided to limit distributions "in order to manage [Gryphon] in the best interests of all members". Two Percent Letter, first paragraph, at 1.

136.     WM owed fiduciary duties to Gryphon and to Gryphon's investor-members.

137.     The actions of WM described in this Complaint, including ,without limitation, its collusion with Donald in making the effective time of the McDonald Redemption Request retroactive to December 31, 2007, violated its fiduciary duties to Gryphon and Gryphon's investor-members.

138.     One or more of the Defendants, through and as a result of the actions of Donald, encouraged and profited from WM's breach of duty.

26

139.    Education Trust Defendants and McDonald Sub-Trust Defendants are therefore liable for aiding and abetting WM's breach of fiduciary duty.

WHEREFORE, Faye B. Feinstein, as Receiver for WML Gryphon Fund LLC, respectfully demands judgment in her favor and against Defendants, jointly and severally, as appropriate, on Count VI of this Complaint and asks the Court to:

A.    order Defendants to pay to the Receiver the value of the Transfers, for the benefit of Gryphon's receivership estate;

B.    order Defendants to pay pre-judgment interest on the judgment described in Paragraph (A) at the highest legal rate; and

C.    award the Receiver, on behalf of Gryphon, such other and further monetary and equitable relief, including, without limitation, punitive damages, as the Court deems appropriate.

Dated this 20th day of January, 2011             s/Jane E. Appleby
                                                                            One of the Receiver's Attorneys

Michael H. Schaalman
Jane E. Appleby
411 East Wisconsin Avenue, Suite 2040
Milwaukee, WI 53202
Telephone: (414) 277-5000
Facsimile: (414) 978-8944
E-mail: michael.schaalman@quarles.com
            jane.appleby@quarles.com


Prepared by:

Christopher Combest
QUARLES & BRADY LLP
300 North LaSalle Street, Suite 4000
Chicago, IL 60654
Phone: (312) 715-5000
Facsimile: (312) 632-1727
E-mail: christopher.combest@quarles.com

*Counsel to Faye B. Feinstein, Receiver*

QB\12277798.3